**TWIN CITY PLAZA, INC., Appellant,**

v.

**CENTRAL SURETY AND INSURANCE CORPORATION, Appellee,**

and

**Herbert V. Andersen and Gladys R. Andersen, Executrix of the Estate of Alfred C. Andersen, Sr., Deceased, Appellees.**

**No. 19277.**

United States Court of Appeals
Eighth Circuit.

April 18, 1969.

Benjamin M. Wall, of Foulks, Wall & Wintroub, Omaha, Neb., for appellant; Beber, Richards & Polack, Omaha, Neb., was on the brief.

J. A. C. Kennedy, Jr., of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for appellees; Joseph R. Moore, of Gaines, Spittler, Neely, Otis & Moore, Omaha, Neb., was on the brief.

Before MATTHES, GIBSON and LAY, Circuit Judges.

LAY, Circuit Judge.

This is an action by a land developer, Twin City Plaza, Inc., against the bonding company of a sewer contractor. Twin City (hereafter called the owner) sought indemnification from the bonding company for damages arising out of the alleged faulty construction of a sewer line laid originally in 1962 in a new subdivision called Twin Cities Plaza near Council Bluffs, Iowa. The general contractor and principal on the bond was a partnership, Andersen Construction Co., which sublet the construction of "Section III" for the sanitary sewer to J. E. Blue d/b/a J. E. Blue Sewer & Water Co. These contracts were entered into in March and May of 1962. After completion of the original sewer work in May of 1962, the owner's agent, Henningson, Durham & Richardson, an engineering and architectural firm (hereafter called HDR), issued a certificate of final approval. Thereafter, commencing in December 1962, a portion of the line was replaced by substituting cast iron pipe for the original vitrified clay pipe. This work was also done by J. E. Blue's company, Bi-States Construction Co., Inc., a newly formed corporation succeeding the sole proprietorship of J. E. Blue d/b/a J. E. Blue Sewer & Water Co. In 1964 the owner found it necessary to uncover and replace 264 feet of the system's main line. The 1964 work was done by another construction company. The owner now seeks indemnity from the contractor's bonding company for the reconstruction done in 1964. The trial court excluded from evidence testimony by plaintiff's experts offered to show the alleged causal connection of the ultimate disrepair with the original work performed under the contract covered by the performance bond. At the close of the plaintiff's evidence the trial court dismissed plaintiff's claim as failing to make out a prima facie claim for relief. We affirm in part and reverse in part.

The issues on appeal may be divided into two phases. First, we deal with the court's exclusion of evidence relating to the "repair" work performed by the "original subcontractor" from December 27, 1962 to January 7, 1963, when J. E. Blue's Company, Bi-States Construction Co., Inc., replaced the vitrified clay pipes originally specified under the 1962 contract with cast iron pipes. The owner claims certain damage to the sewer line arising from Bi-States' alleged faulty connection between the cast iron pipe and the clay pipe, performed in December 1962. In an attempt to prove this damage, plaintiff claims that J. E. Blue, as the original subcontractor, had a duty under the original contract to maintain and repair the sewer for a period of two years after completion. It is claimed that the laying of the cast iron pipe was work performed as a "repair" and therefore any faulty performance in the laying of the cast iron pipe was covered under the performance bond. The trial court excluded evidence relating to Bi-States' "defective connection" of the cast iron pipe with the clay pipe on the ground that this work was not part of the original contract between the owner and the principal under the bond, Andersen Construction Co. We agree with this ruling.

The evidence shows that in December 1962 the owner contracted directly with J. E. Blue to replace the original pipe. The trial court ruled that Bi-States Construction Co., Inc., Blue's newly formed company, in laying the cast iron pipe was performing work outside the original contract.

Several facts conclusively establish this:

1. It is admitted that the laying of the cast iron pipe was a "modification" of the original contract decided upon by the owner's engineer. The laying of 80 foot cast iron pipe was decided upon after discovery of extensive infiltration in the latter part of 1962. As Mr. Bailey, HDR's chief engineer, stated, "With a vitrified clay pipe where the sewage might infiltrate out and contaminate the water supply, we put in cast iron so there are fewer joints and potential areas to keep the sewage within the main." Bailey said he decided to "modify the

design of the material." The cast iron pipe came in 20-foot sections whereas the clay pipe was laid in 5-foot sections. The owner had specified the clay pipe on the original contract plans. The modification of the work, calling for a change in material in the pipe and a replacement after the original work had been completed and accepted, was clearly not within the contemplation of the parties when they entered into the original contract. Cf. Salt Lake City v. Smith, 104 F. 457, 466–467 (8 Cir. 1900). The installation of the cast iron pipe was not a "repair" but in fact a reconstruction of the sewer. See Friedman v. Le Noir, 73 Ariz. 333, 241 P.2d 779 (1952); Berry v. McConnell, 187 Mo.App. 673, 173 S.W. 100 (1915). A new contract price was agreed upon, specifying the same unit price as called for with the few sections of cast iron pipe specified on the original contract. This was $1.60 per unit more than the replaced clay pipe.

2. Even though Andersen Construction Co., the original contractor, served only as an intermediary to supply the bond, nevertheless, it existed as more than a mere "shell." It is significant that at the time of the new contract as to the modification with cast iron pipe, the original contractor received no notice of the work.

3. Plaintiff's chief engineer, Mr. Bailey, entered into a new contract directly with Bi-States Construction Co., Inc. as the contractor for the modified work. The owner's progress estimate recognizes Bi-States Construction Co., Inc. as the contractor on the job.

4. The same progress estimate requires the owner to make payment directly to Bi-States Construction Co., Inc., evidencing the owner's direct obligation to Bi-States as the contractor. This arrangement is particularly significant in view of the fact that under Nebraska law a subcontractor has no privity with the owner. See Campbell v. Kimball, 87 Neb. 309, 127 N.W. 142 (1910); School Dist. of Beatrice v. Thomas, 51 Neb. 740, 71 N.W. 731 (1897). The payments under the original contract, on the other hand, went directly to Andersen Construction Co., which made no profit from the replacement work as it had under the original contract. Under these circumstances the evidence is susceptible of but a single inference, and the legal relationship of the parties was thus one of law for the court. Cf. Wooddale, Inc. v. Fidelity & Deposit Co., 378 F.2d 627 (8 Cir. 1967). It is clear, as the court found, that Bi-States Construction Co. Inc. was not performing work as a subcontractor operating under the original contract.

The fact that the contractor Andersen sent Bi-States Construction Co., Inc. out to inspect the lines in 1964, after receiving the owner's demand letter for repair in August of 1964, is not in any sense a ratification of the 1962 separate agreement as to the cast iron pipe. Nor does plaintiff's contention of agency or apparent agency on the 1962 work apply here. Agency arises from the principal's authority, actual or implied. None existed here. In the instant case Andersen did not even know about the owner's modification and Bi-States' separate agreement to perform. Apparent authority arises from conduct by the principal to cause good faith belief that the agent was acting within the scope of his authority. See Rodine v. Iowa Home Mut. Cas. Co., 171 Neb. 263, 106 N.W.2d 391 (1960). The new contract in December 1962 clearly demonstrates that plaintiff did not misconceive Bi-States' role as a subcontractor. Plaintiff had no authority, implied or otherwise, under the original agreement to contract directly with the subcontractor, and when it did so, the relationship assumed a new legal meaning. We conclude that the district court properly ruled that any evidence of damage to the sanitary sewer arising from the alleged faulty connection of the cast iron pipe in December 1962 was not covered under the original contract and the performance bond governing the same.

This brings us to the second phase of plaintiff's case. Plaintiff proffered testimony by its engineering experts in

an attempt to show that the ultimate damage to the sewer lines was caused by faulty connections made in the laying of the clay pipe at the time of its original construction in 1962. The trial court sustained objections to this evidence generally on the basis that the answers would be speculative and conjectural and therefore not proper evidence.

■■ The primary basis of the objections to this evidence related to the fact that other intervening causes (e. g. poor soil conditions, excess surface loads, damage by other contractors, etc.) were also shown to exist. These facts were developed either on defendant's foundational cross-examination of the experts leading to the objection, or in the hypothesis itself. Defendant, relying upon Nebraska law, now maintains that plaintiff's hypothetical questions sought the ultimate fact and therefore invaded the province of the jury.[1] However, the federal rule is different, and it governs here. Jones v. Goodlove, 334 F.2d 90 (8 Cir. 1964); Barnes v. Omark Indus., Inc., 369 F.2d 4 (8 Cir. 1966).

■ This court has set forth rules governing hypothetical questions in other cases. See, e. g., Barnes v. Omark Indus., Inc., supra; Harris v. Smith, 372 F.2d 806, 812 (8 Cir. 1967); Grand Island Grain Co. v. Roush Mobile Home Sales, Inc., 391 F.2d 35 (8 Cir. 1968). It would serve little purpose to repeat all of these principles again. When it is deemed necessary that a hypothetical question be used,[2] generally we have held the better view to be that only the basic facts need be assumed in the hypothesis. This does not require a witness to listen to a long detailed hypothesis of other negative factors, as long as the basic conditions are disclosed to give the expert a reasonable foundation from which to give his opinion. When other facts exist which cast a doubt on the conclusion, then these facts are best brought out on cross-examination to test the witness' credibility. Thus, conflicting factors which weaken opinion evidence are, at least in the federal view, best left to the trier of facts rather than affecting the foundation for admission of the answer itself.

■ When basic foundational conditions are themselves conjecturally premised, it then behooves a court to remove the answer from one of admissible opinion to one of excludable speculation. Thus, a court may exclude evidence where an expert is asked for the speed of a vehicle based upon skid marks, when foundational evidence showing that the skid marks belong to the car in question is totally lacking. See, e. g., Sheets v. Davenport, 181 Neb. 621, 150 N.W.2d 224 (1967). However, when such basic, relevant conditions are proven and the witness possesses sufficient qualifications, the answer is best received for whatever value it may ultimately have. See, e. g., Builders Steel Co. v. Commissioner of Internal Revenue, 179 F.2d 377, 379 (8 Cir. 1950); Hartford Fire Ins. Co. v. Thompson, 175 F.2d 10, 14 (8 Cir. 1949); Dickerson v. Shepard Warner Elev. Co., 287 F.2d 255 (6 Cir. 1961); Bratt v.

---

1. We also note that many, though not all, of plaintiff's hypothetical questions on the general hypothesis to the witness were phrased: "assume all the evidence on the exhibits to be true" or "assuming the testimony of the other witnesses." This is improper. If the objection had been based upon this ground, it would properly have been sustained. However, neither defendant's objections nor the court's ruling was based on this ground. Plaintiff was not put on notice to amend these questions, since it was clear that the trial court would not receive the testimony in any event.

2. And we share the Federal Rules of Evidence Advisory Committee's salutary suggestion that use of the hypothetical question be limited. See discussion, infra, Rule 7–05. Direct questions seeking expert opinion may be subsequently explored on both direct and cross-examination as to the underlying factual data. This approach would also generally eliminate extended foundational cross-examination for purposes of making objections.

Western Air Lines, Inc., 155 F.2d 850 (10 Cir. 1946). And this is true, even though the expert may make his observation at a time remote from the event. Cf. Joseph A. Bass Co. v. United States to use of Peter Kiewit Sons' Co., 340 F.2d 842, 845 (8 Cir. 1965).

The proposed draft of the Federal Rules of Evidence published in March 1969, suggest pragmatic rules relating to the admissibility of expert opinions. A distinguished committee [3] of jurists and lawyers have formulated principles which suggest guidelines better to facilitate the use of expert testimony. These particular rules should prove beneficial to the expert witness, the court and especially to the trier of fact's ability to evaluate the testimony offered. The rules are obviously designed to remove stereotyped, long, belabored and nonsensical hypothetical questions from the arena of trial. They are designed to make expert testimony more communicative to the trier of fact without totally destroying exclusionary rulings. See Rules 7–01, 7–02, 7–03, 7–04 and 7–05 and the Advisory Committee comments pertaining thereto. Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates (1969). Many of these more realistic rules have long been advocated by leading authorities in the evidence field. See, e. g., Ladd, Expert Testimony, 5 Vand.L.Rev. 414 (1952).

Under Rule 7–05, relating to "disclosure of facts or data underlying expert opinion," the Committee proposes:

"The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." See also the Advisory Committee's note p. 271.

We turn now to the facts at hand. The testimony of plaintiff's chief engineer on the project was excluded when offered to show that damage to the sewer line was at a depth below load damage caused by heavy equipment passing over the same area. Defendant urged that this testimony would contradict an extra judicial statement made by the engineer concerning the same area of damaged line. However, in view of the principles previously discussed, we think this evidence was competent for the jury to consider, notwithstanding statements which might detract from its credibility. The engineer, Mr. Bailey, was highly qualified and the subject matter concerning live and dead load factors of sewer design is a matter peculiarly within the competence of this expertise. Surface load effect upon sewer pipes at various depths depends upon variable factors and is a subject which involves engineering skill and knowledge. See, e. g., "Handbook of Steel Drainage and Highway Construction Products," p. 42 1967 ed., published by American Iron and Steel Institute. We think this testimony and the engineer's explanation of it was admissible for jury consideration.

Plaintiff offered testimony by its engineers as to their observations of damaged lines and infiltration at a time two years subsequent to the original installation. This was at a time when the pipes were uncovered for ultimate repair. It is true that several intervening factors had taken place before the observations were made. There exists the possibility that one or more of these

3. Names of committee members are: Albert E. Jenner, Jr., Chairman, Prof. Edward W. Cleary, Reporter, Chief Judge Joe Ewing Estes, United States District Court for the Northern District of Texas, Prof. Thomas F. Green, Jr., Dean Charles W. Joiner, Judge Simon E. Sobeloff, United States Court of Appeals (4 Cir.), Judge Robert Van Pelt, United States District Court for the District of Nebraska, Judge Jack B. Weinstein, United States District Court for the Eastern District of New York, David Berger, Hicks Epton, Robert S. Erdahl, Egbert L. Haywood, Frank G. Raichle, Herman F. Selvin, Craig Spangenberg and Edward Bennett Williams.

factors, other than the subcontractor's alleged faulty construction, had caused the damage. There was evidence that some of the pipe was broken at the time that it was being dug up and exposed in 1964. Nevertheless, as we view the record it was plaintiff's theory as evidenced by the offers of proof, that the overall damage to the line was caused by the defective initial construction completed in May of 1962. According to plaintiff's experts, this was allegedly inferable from the fact that the original joint material was observed as discolored in 1964, thereby evidencing that it was not in proper contact with other joint material when originally laid. We once again find that this was admissible evidence and within the proper realm of expert testimony and that it should have ben admitted. Cf. Bratt v. Western Air Lines, Inc., 155 F.2d 850 (10 Cir. 1946). The credibility of such evidence under these circumstances was for the jury to weigh. See Roth v. Bird, 239 F.2d 257, 261, 262 (5 Cir. 1956).

Defendant places emphasis upon the fact that plaintiff's engineers supervised the construction and approved the work. However, the contract itself made clear that the engineer's certificate of acceptance did not release the contractor from liability for defective work. See School Dist. No. 65R v. Universal Sur. Co., 178 Neb. 746, 135 N.W.2d 232, 234 (1965). This is not to say that this factor may not become significant in the jury's weighing the evidence as to whether there was in fact defective workmanship in the original instance.

 Under Nebraska law, the issues of proximate cause and intervening cause are generally for the jury. Apropos here is the rule as approved by the Nebraska Supreme Court in Petracek v. Haas O. K. Rubber Welders, Inc., 176 Neb. 438, 444, 126 N.W.2d 466, 470 (1964), quoting from Howell v. Robinson Iron & Metal Co., 173 Neb. 445, 113 N.W. 2d 584:

" 'The burden of a plaintiff, relying on circumstantial evidence to sustain a cause of action for damages, does not require him to exclude the possibility that damages flowed from some other cause other than the one on which he relies.' "

See also Wray M. Scott Co. v. Daigle, 309 F.2d 105 (8 Cir. 1962); Ford Motor Co. v. Mondragon, 271 F.2d 342 (8 Cir. 1959).[8]

---

8. We are not directly confronted at this time with whether the evidence was sufficient to make a prima facie case to the jury. As indicated, the plaintiff did not explore his total case because of the objections raised. On the surface, it would appear that if plaintiff's experts were allowed to answer the questions, a prima facie case would exist under Nebraska Law. Cf. Wray M. Scott Co. v. Daigle, 309 F.2d 105 (8 Cir. 1962). In any event we do not decide this here. We therefore are not confronted with the issue whether the rule governing the sufficiency of evidence is one of federal or state law. Cf. Denneny v. Siegel, 407 F.2d 433 (3 Cir. Feb. 20, 1969); Wratchford v. S. J. Groves & Sons Co., 405 F.2d 1061 (4 Cir. 1969). In the past we have avoided this decision on the assumption that the particular state law and the federal law are the same. See, e. g., Grand Island Grain Co. v. Roush Mobile Home Sales, Inc., 391 F.2d 35 (8 Cir. 1968). However, contrary to our previous observations, the law in Nebraska may not be the same as our federal rules governing sufficiency of evidence. Compare Davis v. Dennert, 162 Neb. 65, 75 N.W.2d 112 (1956), and then subsequently, Chief Justice White's excellent concurring opinion in Wolstenholm v. Kaliff, 176 Neb. 358, 366, 126 N.W.2d 178, 183 (1964), where he challenges the resurrection of the pre-Davis rule (overruled in Davis). As pointed out in Davis, the rule requiring proof justifying only one inference or conclusion comes from the criminal law necessitating proof beyond a reasonable doubt. This is not the federal rule in civil cases (see, e. g., Ford Motor Co. v. Mondragon, 271 F.2d 342 (8 Cir. 1959); Coca Cola Bottling Co. v. Hubbard, 203 F.2d 859 (8 Cir. 1953)) nor is it any longer followed in federal criminal cases (see Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and discussion in McClard v. United States, 386 F.2d 495, 507 n. 5 (8 Cir.

We have not attempted to delineate every question and ruling of exclusion governing plaintiff's case. We feel generally that the answers of plaintiff's experts were admissible and should not have been excluded due to the existence of other possible causes. A party in a civil case has only the burden of proving his case by the preponderance of evidence. The existence of other possible causes cannot completely control the outcome of a plaintiff's case. Otherwise a party could never prove a prima facie case. In most instances it is for the jury to decide which conduct contributed or caused all or part of the damage involved. If the witness, based upon his background skill, possesses extraordinary training to aid laymen in determining facts and if he bases his answer upon what he believes to be reasonable scientific or engineering certainty, generally the evidence should be admitted, subject, of course, to the cross-examination of the adversary. The weaker the scientific opinion or the less qualified the expert, the more vigorous will be the cross-examining attack and undoubtedly the less persuasive will be the opinion to the trier of fact.

Judgment of dismissal is vacated and remanded for a new trial in accordance with this opinion.

1968) (dissenting opinion)). The language in *Petracek* quoted in the text has not been overruled by the Nebraska Supreme Court. Although other Nebraska cases seemingly contradict these principles, until the Nebraska court specifically overrules Davis v. Dennert, supra, we consider it as being the correct statement of the law in Nebraska. The Nebraska law set forth in Howell v. Robinson Iron & Metal Co., 173 Neb. at 449, 113 N.W.2d at 587 and again approved in Petracek v. Haas O. K. Rubber Welder's, Inc., 176 Neb. at 445, 126 N.W.2d at 469, and the federal rule are the same. The Nebraska court there said:

"The burden of establishing a cause of action by circumstantial evidence requires that such evidence, to be sufficient to sustain a verdict or require submission of a case to a jury, shall be of such character and the circumstances so related to each other that a conclusion fairly and reasonably arises that the cause of action has been proved."

The federal rule is well expressed in Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4 Cir., 1958):

"The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is as probable as the other, has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."